UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| Mae Merriweather, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 15 CV 50143 |
| | ) | Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mae Merriweather brings this action under 42 U.S.C. §405(g), challenging the denial of social security disability benefits.

## BACKGROUND

In the spring of 2011, plaintiff filed her applications for disability insurance benefits and supplemental security income. She alleged a disability beginning January 1, 2009, and complained about high blood pressure, bronchitis, emphysema, an enlarged heart, thyroidism, and kidney problems. R. 48. Insofar as this Court can tell, there was no mention of what is now the central focus of this appeal—namely, dizziness and fainting.

On May 19, 2011, Dr. Vidya Madala, an agency doctor, reviewed plaintiff's records and concluded that the above-listed problems did not render plaintiff disabled because she could, among other things, stand or walk six hours a day. R. 52.

On Oct. 26, 2011, Dr. K.P. Ramchandani examined plaintiff and her medical records. Plaintiff presented with shortness of breath, lifting difficulties, a chronic cough, and lumbar pain. R. 611. There is again no mention in this report of any problems with dizziness and, in his

1

review of systems, Dr. Ramchandani noted that plaintiff denied syncope (the medical term for fainting). R. 612. Dr. Ramchandani administered a pulmonary test measuring plaintiff's scores in technical areas such as FEV1 and FVC. He concluded that she had the following conditions: (1) "COPD in a patient with history of tobaccoism"; (2) "Arthralgia of the lumbar spine"; (3) "uncontrolled hypertension in a patient with history of proteinuria"; and (4) "Status-post thyroidectomy for multi nodular goiter currently on replacement therapy." R. 613.

On November 3, 2011, another agency doctor, Dr. Marion Panepinto, reached basically the same conclusion as did Dr. Madala earlier in the year. Ex. 8A.

On August 8, 2013, a hearing was held before an administrative law judge (ALJ). Plaintiff was represented by her first counsel. Plaintiff was then 59 years old and was living with her daughters, one who was 33 years old and the other 15 years old. She testified that her problems began in January 2009, which was her onset date, when she began experiencing problems breathing and walking, as well as dizziness and fainting. She did not know what caused her breathing problems, although she had been diagnosed with emphysema. As of January 2009, she was getting dizziness "maybe twice a week" and the episodes lasted "about 30 seconds." R. 16-17. At the date of the hearing (August 2013), she was having these episodes "about four times a month," and they still lasted about 30 seconds. R. 17.

The ALJ next asked plaintiff about her recent work activity. In 2011 and 2012, she worked out of her home making and selling dinners to people who would come by and pick them up. She worked on average 25 hours a week and was on her feet most of the time. Also in this same period (*i.e.* 2011-12), she received unemployment compensation. From June 2008 to January 2011, she worked as a sales associate at Walmart, where she was on her feet the whole time except for breaks.

The ALJ next questioned plaintiff about daily activities. She testified that she spent most of her day "laying down." R. 23. She testified that she did not do any cooking and that her daughter prepared the meals. She last did laundry three or four months ago and last swept around the house six months ago. She went to the store about 3 times a month. Although she did not walk much, except for an occasional visit to the corner store, her doctors advised her to walk to keep her blood pressure down. She stated that she has her blood pressure checked when she goes to the doctor and at Walmart and that it has been "pretty steady." R. 28. She was taking various medications for her blood pressure. When asked whether there were any periods in which she did not take her medications, she testified that there were "a few times like in 2011 that I really didn't have the money to really get them." R. 30. She has been a smoker since age 11. She has uses an inhaler twice a day on average, but does not have use a nebulizer machine.

Later in her testimony, plaintiff testified that she had an MRI recently and that her doctors told her that "the blacking out was strokes." R. 36. This testimony seemed to surprise the ALJ as he interjected: "Wait a minute, nothing of that's put in the record. Are we missing something?" R. 37. Plaintiff responded that she went to the doctor just the previous week and that was when her doctor told her that she had "little bitty strokes." *Id.* This information was apparently also new to plaintiff's counsel. The ALJ and counsel then agreed that these new records should be provided to the ALJ after the hearing. The ALJ seemed frustrated that the records were not provided earlier, telling plaintiff the following: "You got to give your lawyer a head's up, ma'am." R. 38.

About a month after the hearing, plaintiff's first counsel submitted the missing records from the Crusader Clinic along with a letter explaining what he considered to be significant about them. R. 340-41. Counsel focused on a spirometry study and argued that it showed that

plaintiff had breathing problems. Counsel made no argument regarding strokes or fainting problems. Nor did counsel make any request a follow-up hearing or ask for a new medical opinion.

On February 28, 2014, the ALJ issued his opinion finding plaintiff not disabled. The ALJ found that plaintiff had the following severe impairments: "arthralgias of lumbar spine and left shoulder, history of carpal tunnel syndrome, chronic obstructive pulmonary disease (COPD), hypertension, history of hyperthyroidism, status post thyroidectomy, history of chronic kidney disease (CKD), history of renal calculi, obesity (BMI 35) and tobacco abuse." R. 92. The ALJ found that plaintiff did not meet any listing. He specifically considered whether she met Listing 3.02 that is based on FEV1 values and the spirometry test. Plaintiff does not challenge this finding on appeal. The ALJ found that plaintiff had the residual functional capacity to do light work subject to certain limitations. The ALJ's rationales are discussed below.

On March 31, 2014, plaintiff's first counsel wrote a letter to the Agency seeking a review of the ALJ's decision. In this letter, counsel again focused solely on the issues "related to [plaintiff's] chronic obstructive pulmonary disease." R. 207. There was no mention of any problems with dizziness or fainting, nor any reference to the MRI or to possible strokes.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by

reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

In this appeal, plaintiff (now represented by a different attorney from the same law firm) argues that the ALJ made two significant errors. First, the ALJ allegedly failed to fully discuss evidence relating to dizziness and fainting. Second, the ALJ allegedly improperly evaluated plaintiff's credibility.

Before addressing these arguments, the Court will summarize the Government's arguments as they form a backdrop to these two arguments. The Government makes the following four interrelated, overarching points. First, the ALJ relied on two state agency doctors (Drs. Madala and Panepinto) who opined that plaintiff was able to work. Second, plaintiff has not submitted any medical opinion supporting her claimed limitations. Third, it is plaintiff's burden to bring forward evidence establishing that she is disabled. *See* 20 C.F.R. § 404.1512(a); *Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008) ("The claimant bears the burden of producing medical evidence that supports her claims of disability. That means that the claimant bears the risk of uncertainty, even if the reason for the sparse record is simply a long lapse of time."). Fourth, because plaintiff was represented by counsel, there is a presumption that

plaintiff's best arguments were raised. *See Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) ("Pepper failed to satisfy her burden [of proving that she was disabled]. This is especially true considering Pepper was represented by counsel throughout the pendency of the proceedings."); *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007).

With these points in mind, the Court turns to the first significant alleged error, which is that the ALJ failed to fully discuss her dizziness and fainting. Plaintiff makes several lesser-included arguments. She first argues that the ALJ "did not make a conclusion about the frequency of Ms. Merriweather's episodes of dizziness/fainting." Dkt. #12 at 4. However, as plaintiff recognizes, the ALJ accurately summarized plaintiff's allegations about the frequency of these episodes.[1] Although plaintiff suggests that an explicit finding about frequency should have been made, plaintiff never states what the alleged frequency was so that the Court does not even know if the frequency was different and never offers a larger argument as to why an explicit finding on this precise issue would have led to a different result. Plaintiff next complains that the ALJ simply "recounted the chronological history of treatment and highlighted any portions of the records that did not mention the episodes." *Id.* This assertion is true in that the ALJ noted the many times in the record in which plaintiff failed to complain about fainting or syncope.[2] But plaintiff does not explain why it would be wrong to point out and rely on these facts. They generally support the ALJ's conclusion that these issues were not so serious as to prevent

---

[1] *See* R. 93 (ALJ: "She had dizziness twice a week. The episodes lasted 30 seconds and she would lose consciousness. It still happens now, about 4 times a month for 30 seconds each time."). This summary accurately conveys plaintiff's testimony that, in January 2009, she was having these episodes twice a week, but that in August 2013, it was four times a month. Though not explicitly commented on by the ALJ or the parties, this seems to be a drop-off in frequency, a point that is in tension with plaintiff's portrayal of her problems as worsening.

[2] *See* R. 93 (5/22/08 hospital visit: no "syncopal type episodes"); R. 93 (2/8/08 emergency room visit: "There were no reports of loss of consciousness or of syncopal type episodes"); R. 94 (12/17/09 doctor visit: "no recorded report of syncopal or syncopal like episodes"); R. 94 (9/10/10 hospital visit: "no report of syncopal like episodes"); R. 94 (1/3/11 doctor visit: "no reports of syncopal like episodes"); R. 94 (9/14/11 doctor visit: "no report of syncopal or black out like episodes"); R. 94-95 (10/24/11 visit: "Claimant reported no history of syncopal or black out like episode"); R. 95 (8/2/13 visit: "no report of syncopal like or black out episodes.").

6

plaintiff from working. Moreover, in this same summary, the ALJ also included several instances when plaintiff made these types of complaints.[3] Though not fully articulated, plaintiff's argument seems to be that there were *more* such instances and that the ALJ ignored them. The problem with this argument is that, other than the visits just before the hearing (discussed below), plaintiff does not cite to any evidence that the ALJ supposedly ignored, and it is not this Court's job to rummage through the 725-page record to try to find such authority. *See U.S. v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

This leads to plaintiff's primary fainting-related argument. She argues that the ALJ ignored evidence in the Crusader records submitted post-hearing. Plaintiff argues that these records "showed ischemic changes, which corroborates Ms. Merriweather's testimony that her treating providers at Crusader clinic had found that the MRI showed *the cause of* her episodes." Dkt. #12 at 4 (emphasis added). This argument is not persuasive for several reasons.

First, although not raised by the Government, it nonetheless important to note that plaintiff's counsel at the administrative hearing never raised these arguments now being made by his current counsel. As described above, Mr. Esmond submitted two letter briefs both focusing on the recently-submitted Crusader records and both raising specific evidence-based arguments as to why plaintiff was disabled. But neither raised any issue about plaintiff's possible strokes causing the fainting episodes. The first counsel's failure to raise these arguments suggests not only that he did not consider them significant, but also explains why the ALJ may have chosen not to discuss them in great detail. As the Government points out, the Seventh Circuit has held

---

[3] *See* R. 95 (3/18/13 visit: "claimant complained of recurrent 'blacking out with loss of consciousness'"); R. 95 (7/12/13 visit: "complaint of three episodes of dizziness since claimant's last visit").

that "a claimant represented by counsel is presumed to have made his best case before the ALJ." *Skinner*, 478 F.3d at 842.

Second, contrary to the impression created by plaintiff, the ALJ did not ignore these records. He summarized them in a paragraph, describing plaintiff's three visits to Crusader on July 12th, July 26th, and August 2nd.[4] As for the July 12th visit that plaintiff relies heavily on now, the ALJ noted that plaintiff complained of three episodes of dizziness since her last visit but that there was no loss of consciousness. As for the August 2nd visit, the ALJ observed that plaintiff complained about various problems but "[t]here was no report of syncopal like or blackout episodes." R.95. However, the bulk of the paragraph focused on the spirometry test (which, by the way, was normal), which is the issue flagged by the first counsel.

Third, although it is true that the ALJ did not specifically mention the issue of strokes and their possible relationship to fainting episodes, plaintiff has not pointed to any medical evidence supporting her lay-person speculation that this information was significant. To recap, plaintiff has not submitted the MRI report itself (a fact the Government complains about), but instead relies on the two-page Progress note written by Dr. Silva about plaintiff's July 12, 2013 office visit. Plaintiff's entire argument rests on the following passage in the section entitled History of Present Illness:

> Pt has had about 3 dizziness episodes since last visit.[5] Had Brain MRI done recently. She denies new symptoms on ROS. MRI shows righ[t] maxillary sinus opacity and mastoid air cell opacity; *chronic ischemic changes in brain*.

R. 709 (emphasis added). Plaintiff relies particularly on the five-word italicized phrase.

However, as the Government points out, there is nothing in this two-page report

---

[4] The substantive portion of these records consists of 10 pages. R. 704-713.
[5] It appears, based on the hearing testimony, that the last visit referred to here was in March. R. 37. This would mean that plaintiff had three dizziness episodes in roughly three months, a frequency of one per month, which is even less than the four-times-a-month frequency she testified as having at this time.

suggesting that Dr. Silva himself believed that the MRI finding—"chronic ischemic changes"—was significant. In the section entitled "Assessments," he made no reference to ischemic changes, to strokes, or to dizziness or fainting, but instead focused on plaintiff's sinusitis and chronic obstructive pulmonary disease. Likewise, in the section entitled "Treatments," there is no reference to any of the fainting-related issues. Dr. Silva did not recommend (insofar as this Court can tell) that plaintiff be tested further or be given any specific treatment for alleged strokes. In light of all the above, the Court finds that the ALJ did not err in how he addressed these issues.

The other alleged significant error, according to plaintiff, is that the ALJ erred in the credibility analysis. Plaintiff makes three specific complaints: the ALJ misinterpreted plaintiff's daily activities, wrongly faulted her for having treatment gaps and not taking medications, and improperly noted that she had failed to quit smoking. In its response brief, the Government basically concedes (for the sake of argument) that the ALJ's handling of these issues may have been flawed, but argues that the ALJ's determination should be upheld because there are *other* valid reasons supporting the conclusion.

Before addressing these other reasons, the Court first briefly notes for the sake of perspective that the ALJ's alleged three errors are not obvious in every instance, nor especially egregious in this Court's view. First, plaintiff argues that the ALJ overstated her daily activities by stating, for example, that she could prepare simple meals even though she testified that her daughter did all the cooking. R. 24. But plaintiff fails to note that the ALJ's statement was based on the Function Report (Ex. 5E) that plaintiff herself completed and on which she checked the box "Yes" as to whether she could prepare simple meals.[6] R. 299. Second, as for treatment gaps, plaintiff is correct that the ALJ should have explored more fully possible difficulties she may

---

[6] Although not relied upon by the ALJ, it is worth noting that in 2011 and 2012 (*i.e.* after the disability onset date), plaintiff was running a business out of her home selling meals to others. This would suggest that she could not only prepare meals for herself but also for many other families at the same time.

have had seeking treatment. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (an ALJ cannot "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin"). At the same time, the only difficulty plaintiff testified about was that were "a few times" in 2011 when she did not have the money to get her blood pressure medications. R. 30. So it is an open question as to whether these difficulties were commensurate with the alleged treatment gaps. Third, as for the point about plaintiff not quitting smoking, plaintiff argues, based on *Rousey v. Heckler,* 771 F.2d 1065, 1070 (7th Cir. 1985), that it was improper for the ALJ to rely on this fact because there was "no evidence supporting that [plaintiff's] breathing would improve if she quit smoking." Dkt. #12 at 5-6. Perhaps plaintiff is right about there being no connection, but this point is far from obvious, especially given that plaintiff had emphysema and given that in July 2013 she was specifically told that cigarette smoking was the primary issue she needed to address. R. 706.

In any event, this Court need not further consider these points because, even accepting plaintiff's arguments, the Court agrees with the Government that the ALJ's other reasons were sufficient to support the credibility determination. Most significantly, as discussed above, the ALJ found that the medical evidence, including the lack of complaints about syncope, did not support plaintiff's allegations. Moreover, no doctor provided an opinion suggesting that, even with all her limitations, she was incapable of working. In fact, she was advised to exercise more. As a separate but additional reason, the ALJ noted that plaintiff had worked in two fairly significant jobs (both requiring standing on her feet) during the same time in which she claimed she was disabled and could do not much more than lie in bed. In making these arguments, the Government relies heavily on two Seventh Circuit cases that it argues are "nearly identical" to this case. Dkt. #17 at 7-8 (citing *Halsell v. Astrue*, 357 Fed. Appx. 717, 722-23 (7th Cir. 2009)

("Not all of the ALJ's reasons must be valid as long as *enough* of them are") and *Kittelson v. Astrue*, 362 Fed. Appx. 553, 558 (7th Cir. 2010)). In her reply brief, plaintiff did not even attempt to distinguish these two cases, both of which affirmed the ALJ's credibility finding, nor did she cite to any contrary cases supporting her arguments.

For the above reasons, the Court is not persuaded by plaintiff's arguments. As the Government has emphasized throughout its response brief, it is plaintiff's burden, especially when represented by counsel, to show that she was disabled. This burden was not met here. Moreover, if this Court were to remand this decision based on the fainting-related evidence submitted after the hearing, it would be unfair to the ALJ because plaintiff's counsel at the time never alerted the ALJ to the existence of this argument, one that was not obvious nor well documented nor supported by any medical opinion.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is denied, the government's motion is granted, and the decision of the ALJ is affirmed.

Date: October 17, 2016        By: _____
                                                       Iain D. Johnston
                                                       United States Magistrate Judge